Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| K.S., and Z.S.,<br><br>       Plaintiffs,<br><br>vs.<br><br>CIGNA HEALTH and LIFE INSURANCE COMPANY, and the ACCENTURE LLP BENEFITS PLAN.<br><br>       Defendants. | COMPLAINT<br><br>Case No. 1:22-cv-00004-DAO |

Plaintiffs K.S. and Z.S., through their undersigned counsel, complain and allege against Defendants Cigna Health and Life Insurance Company ("Cigna") and the Accenture LLP Benefits Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. K.S. and Z.S. are natural persons residing in Travis County, Texas. K.S. is Z.S.'s mother.

2. Cigna is an insurance company headquartered in Bloomfield, Connecticut and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

1

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). K.S. was a participant in the Plan and Z.S. was a beneficiary of the Plan at all relevant times. K.S. and Z.S. continue to be participants and beneficiaries of the Plan.

4. Z.S. received medical care and treatment at Elevations RTC ("Elevations") from February 5, 2019, to March 8, 2020. Elevations is a licensed treatment facility located in Davis County Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Cigna, acting in its own capacity or through its subsidiary and affiliate Cigna Behavioral Health, denied claims for payment of Z.S.'s medical expenses in connection with his treatment at Elevations.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Cigna does business in Utah, many individual participants and beneficiaries of Cigna-insured and administered ERISA benefit plans reside in Utah, and the treatment at issue took place in Utah. In addition, venue in Utah will save the Plaintiffs costs in litigating this case. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for

appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### Z.S.'s Developmental History and Medical Background

9. Z.S. was assigned a female gender at birth, however from a very early age Z.S. experienced gender dysphoria and he now identifies as male. Z.S. began seeing a therapist when he was six years old in an effort to address his frequent emotional outbursts.

10. Z.S. had trouble fitting in with his peers and was often bullied. Around the time that he was eleven years old Z.S. was discovered to be self-harming by cutting. Z.S. then started receiving weekly counseling at school. Z.S. continued to cut in secret and stated that if he had to continue to live as a girl, he would rather not live at all.

11. Z.S. started meeting with a psychiatrist and a psychologist and started taking medications for his mental health and to minimize the onset and effects of female puberty. In the eighth grade, Z.S.'s name and gender were legally changed which did seem to help his mood, however Z.S. continued to self-harm and express thoughts of suicide.

12. Z.S. was hospitalized in a psychiatric facility on October 3, 2017, after which he attended a partial hospitalization program and an intensive outpatient program, however Z.S. continued to self-harm and express suicidal thoughts and was once more hospitalized. Z.S. started attending an online high school, but his suicidal ideation continued and he was hospitalized for a third time.

13. Z.S.'s treatment team recommended that because he had been hospitalized three times over a nine month period he needed to receive residential treatment care in order to resolve his mental health issues. Z.S. was admitted to a facility called Evolve Treatment Center for 30 days, during which the clinical team recommended that Z.S. receive long-term residential treatment. Against the medical advice of Z.S.'s treatment team at Evolve, K.S. admitted him to an intensive outpatient program instead in order to test whether that would be sufficient, but Z.S. again started self-harming and was once again hospitalized.

14. K.S. made arrangements for Z.S. to start attending an outpatient program, but before he could begin he was hospitalized for a fifth time due to self-harming behaviors. His treatment team at the hospital refused to discharge Z.S. until he could be placed in a secure residential treatment environment.

15. Z.S. started attending a treatment center called Polaris and the staff again recommended that he receive residential treatment and he was admitted to Elevations.

**Elevations**

16. Z.S. was admitted to Elevations on February 5, 2019.

17. In a letter dated February 15, 2019, Cigna denied payment for Z.S.'s treatment. The letter stated in pertinent part:

> We reviewed information from Elevations RTC, your health plan and any policies and guidelines needed to reach this decision. We found the service requested is not medically necessary in your case.
>
> Based upon the available information, your symptoms do not meet the Cigna Behavioral Medical Necessity Criteria for Residential Mental Health Treatment for Children and Adolescents for continued stay from 02/05/2019 forward as the treatment provided has led to sufficient improvement in the symptoms and/or behaviors that led to this admission so that you could be safely and effectively treated at a less restrictive level of care.

18. On December 26, 2019, K.S. submitted a level one appeal of the denial of Z.S.'s treatment. K.S. reminded Cigna that under ERISA she was entitled to certain protections, including a review using appropriately qualified reviewers which took into account all of the information she provided, which gave her the specific reasoning for the adverse determination, referenced the plan provision on which the denial was based, and gave her the information necessary to perfect the claim. K.S. reminded Cigna it was obligated to act in her best interest and to provide her with a full, fair, and thorough review.

19. K.S. stated that it was clear from Z.S.'s treatment history and the failure of other levels of treatment to adequately address his mental health needs that he needed the treatment he was receiving at Elevations, especially given Z.S.'s history of suicidal behaviors and how close Z.S. came at times to taking his own life.

20. K.S. included letters of medical necessity with the appeal. In a letter dated November 12, 2019, John Abraham, D.O., wrote in part:

> Based on my experience with [Z.S.] along with the updates his parents have given me, I could not assert more strongly that I feel residential treatment is the appropriate level of care for him. I have researched Elevations, spoken with colleagues in Texas and California who have referred clients there, and have had a number of long conversations with [Z.S.]'s father about the program. Based on all of this, I firmly believe the treatment provided at Elevations is entirely within the generally accepted standards of care.

Ryan Dillon, LPC, MEd, wrote in a letter dated November 9, 2019:

> Due to [Z.S.]'s passion to learn, desire to connect with others, and the safety and community [Z.S.] feels when being around other people I believe that residential treatment is the most appropriate level of care for [Z.S.]. I believe that by being able to express his creative side while learning coping skills and tools in a residential community that [Z.S.] can make the lasting changes and growth that is needed. Based on the information I have been provided by [Z.S.]'s mother [K.S.] and my own independent research into Elevations I believe this treatment is within generally accepted standards of care and highly beneficial to [Z.S.] and his continued growth.

21. K.S. additionally included copies of Z.S.'s medical records with appeal. These records showed that Z.S. continued to struggle with desires and actions of self-harm, negative self-image, depression, anxiety, disordered eating, panic attacks, property destruction, bipolar tendencies, and also included repeated assessments from staff stating he was at high risk of suicide outside of the residential treatment environment.

22. K.S. contended that she had been able to review some of Cigna's internal notes including a document titled "Inpatient Authorization Summary". This document denied payment in large part because "customer has suicidal ideation with NO PLAN, NO INTENT." (emphasis in original)

23. K.S. argued that Cigna's denial was in violation of MHPAEA as it did not require acute level factors such as a plan or intent to commit suicide for subacute level medical or surgical care to be approved. To ensure that the Plan was compliant with MHPAEA, K.S. requested that Cigna perform a parity compliance analysis and provide her with a physical copy of the results of this analysis. She argued she was entitled to these materials under MHPAEA.

24. In addition, K.S. contended that Cigna had evaluated Z.S.'s treatment using the incorrect criteria. She quoted Cigna's continued stay criteria for residential treatment and argued that these were clearly met. She contended however, that Cigna had not actually utilized these criteria and had instead evaluated Z.S.'s treatment using its acute inpatient criteria.

25. K.S. cited to a decision in *Wit et.al. v. United Behavioral Health* in which the court found an insurer's proprietary guidelines to violate generally accepted standards of medical practice on several counts, including an overemphasis on acute symptomology and crisis stabilization, and forcing insureds into a lower level of care regardless of whether such

6

treatment was likely to be effective. K.S. contended that Cigna had violated generally accepted standards of care in the same way the court had found to be impermissible in *Wit*.

26. K.S. asked in the event the denial was upheld that she be provided with the specific reasoning for the determination along with any corresponding supporting evidence, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized to evaluate the claim, any mental health, substance use, skilled nursing, inpatient rehabilitation, or hospice criteria utilized to administer the Plan, as well as any reports from any physician or other professional regarding the claim. (collectively the "Plan Documents")

27. In a letter dated January 28, 2020, Cigna upheld the denial of payment for Z.S.'s treatment under the justification that:

    > Based upon the available clinical information received initially and with this appeal, your symptoms did not meet Behavioral Health Medical Necessity Criteria for admission and continued stay at Residential Mental Health Treatment for Children and Adolescents level of care from 02/05/2019 - 10/17/2019 as although you had long term symptoms and a lengthy treatment history you did not show a clear need for 24 hour nursing and psychiatric monitoring and intervention. The proposed evaluations, medication management, and therapies did not require this intensity of service. You had previous and recent opportunity to learn the coping skills needed to participate in less restrictive treatment. There is no information reported that indicates that this level of care was necessary to achieve measurable clinical improvement that could not have been promoted safely and effectively in a less restrictive level of care. Less restrictive levels of care were available for safe and effective treatment.

28. On March 23, 2020, K.S. submitted a level two appeal of the denial of payment for Z.S.'s treatment. K.S. argued that Cigna had not complied with its obligations under ERISA. She expressed concern that Cigna had not reviewed the correct dates of service and had ignored all of the arguments she raised in her appeal. She also wrote that she was alarmed

7

that Cigna's reviewer appeared not to be certified in child and adolescent psychiatry and stated her belief that this meant the reviewer was not qualified to perform the review in the first place.

29. K.S. contended that Cigna had not performed a parity analysis as she requested. She again asked it to do so and to provide her with a copy of the results. She asserted that Cigna was depriving her of crucial information necessary to effectively appeal the denial of payment. She wrote that Cigna continued to violate MHPAEA and it had ignored her concerns that its criteria violated generally accepted standards of medical practice in the same way United's criteria were found to have done in *Wit*.

30. She wrote that she had discovered an additional manner in which Cigna violated MHPAEA as while it required residential treatment facilities to satisfy a litany of requirements enumerated in proprietary guidelines, Cigna appeared to have no such guidelines for skilled nursing and inpatient rehabilitation. K.S. contended that Cigna could not require mental health services to be subject to certain guidelines for coverage to be approved, and then exempt medical or surgical services from this requirement.

31. She asked how she could receive a fair evaluation of her case when the very standard by which Z.S.'s treatment was measured was flawed. She argued that Cigna had committed these errors intentionally out of financial self-interest. K.S. asked Cigna to correct these errors and once more asked to be provided with a copy of the Plan Documents.

32. In a letter dated April 24, 2020, Cigna upheld the denial of payment for Z.S.'s treatment. The letter gave the following justification for the denial:

> Based upon the available clinical information received initially and with this appeal, your symptoms did not meet Behavioral Health Medical Necessity Criteria for admission and continued stay at Residential Mental Health Treatment for Children and Adolescents level of care from 02/05/2019-03/09/2020 as

    although you were demonstrating impairments in functioning secondary to a mental health disorder, you did not have symptoms requiring active treatment at a 24 hour level of care. You had just discharged from previous mental health residential treatment and that treatment resulted in clinical improvement such that you were no longer requiring treatment at a 24 hour level of care. While you do have a history of chronic, intermittent suicidal ideation, at the time of your admission you had not recently demonstrated actions or made serious threats of harm to yourself or others as a result of a mental health disorder that were of such severity to require the intensity of treatment intervention and 24 hour monitoring of a Residential Mental Health Treatment program for your safe and effective treatment. You were not reported to be exhibiting aggressive behavior or disordered thinking. You were showing behavioral control. You were not reported to have medical instability. You were compliant with medications and tolerating them. You were able to care for your basic needs. You were described as having a supportive family. Less restrictive levels of care were available to assist you with continuing to learn healthy coping skills and for medication management.

33. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

34. The denial of benefits for Z.S.'s treatment was a breach of contract and caused K.S. to incur medical expenses that should have been paid by the Plan in an amount totaling over $260,000.

35. Cigna failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of K.S.'s requests.

## FIRST CAUSE OF ACTION

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

36. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Cigna, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

//

37. Cigna and the Plan failed to provide coverage for Z.S.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

38. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

39. The denial letters produced by Cigna do little to elucidate whether Cigna conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. Cigna failed to substantively respond to the issues presented in K.S.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

40. Cigna and the agents of the Plan breached their fiduciary duties to Z.S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in Z.S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of Z.S.'s claims.

41. The actions of Cigna and the Plan in failing to provide coverage for Z.S.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

//

//

//

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

42. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Cigna's fiduciary duties.

43. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

44. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

45. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

46. The medical necessity criteria used by Cigna for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical

necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

47. The level of care applied by Cigna failed to take into consideration the patient's safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided. Z.S.'s medical records repeatedly warn of a high risk of suicide if he were prematurely discharged.

48. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

49. The explicit language of the SPD, one of the governing plan documents, state that in order for a service to be medically necessary, it must be "in accordance with generally accepted standards of medical practice."

50. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for Z.S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

51. For none of these types of treatment does Cigna exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

52. When Cigna and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of

the Plan based on generally accepted standards of medical practice. Cigna and the Plan evaluated Z.S.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

53. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Cigna's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that Z.S. received.

54. Cigna's improper use of acute inpatient medical necessity criteria is revealed in the statements in Cigna's denial letters such as "you had not recently demonstrated actions or made serious threats of harm to yourself or others." This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that Z.S. received.

55. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

56. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

57. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally

accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

58. As another example of the Plan's improper application of its criteria to evaluate the treatment Z.S. received, the Defendants relied on assertions such as "You were compliant with medications and tolerating them" as a justification to deny treatment.

59. In fact, medication compliance and other factors cited by Cigna such as "You were able to care for your basic needs" serve as an indicator rather than a contra-indicator of the medical necessity of treatment in a non-acute residential setting.

60. K.S. alleged that Cigna violated MHPAEA in yet another way. She contended that in order for residential treatment to be approved, Cigna required that a long list of requirements set forth only in proprietary criteria be met. She also pointed out that Cigna did not appear to have any such criteria for skilled nursing or inpatient rehabilitation care.

61. K.S. contended that Cigna could not mandate that mental health providers satisfy requirements contained in proprietary criteria when it appeared to have no such criteria for medical or surgical care.

62. The items K.S. requested with the Plan Documents included criteria for skilled nursing care as well as other intermediate level medical services. If Cigna did possess criteria for intermediate level medical or surgical care, it had the opportunity to provide K.S. with a copy when she requested a copy of the Plan Documents. However, Cigna ignored or otherwise failed to respond to this request just as it had ignored or failed to respond to K.S.'s other requests.

63. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Cigna, as written or in

operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

64. Cigna and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that Cigna and the Plan were not in compliance with MHPAEA.

65. Despite K.S.'s request that Cigna and the Plan carry out a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Cigna and the Plan have not provided Plaintiffs with any information about whether they have carried out any parity compliance analysis and, to the extent they have carried out that analysis, Cigna and the Plan have not provided K.S. with any information about the results of that analysis.

66. The violations of MHPAEA by Cigna and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

67. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for Z.S.'s medically necessary treatment at Elevations under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

//

//

//

4.     For such further relief as the Court deems just and proper.

DATED this 11th day of January, 2022.

By    <u>s/ Brian S. King</u>
       Brian S. King
       Attorney for Plaintiffs

County of Plaintiffs' Residence:
Travis County, Texas.

17