Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Tera J. Peterson, #12204
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
tera@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| K.S., and Z.S.,<br><br>Plaintiffs,<br>vs.<br><br>CIGNA HEALTH and LIFE INSURANCE COMPANY, and the ACCENTURE LLP BENEFITS PLAN,<br><br>Defendants. | PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT<br><br>Civil No. 1:22-cv-00004  - TC – DBP<br><br>Judge Tena Campbell<br><br>Magistrate Judge Dustin B. Pead |

Plaintiffs K.S. and Z.S., through their undersigned counsel, move the Court for summary judgment against Defendants Cigna Health and Life Insurance Company ("Cigna") and the Accenture LLP Benefits Plan (the "Plan") (collectively, "Defendants").

**OVERVIEW**

Everything the Court needs to understand this case can be summed up in two undisputed facts. First, in its denial letters, Cigna consistently takes the position that Z.S. did not need the residential mental health treatment he received at Elevations from February 5, 2019 onward because it contends he could have been safely treated without 24/7 supervision and monitoring.

1

Second, on February 5, 2019, Z.S. experienced suicidal and self-harm urges that promptly caused Elevations staff to deem him a suicide and self-harm risk, which they safely managed through 24/7 supervision and monitoring.

This is not the only reason Cigna's decisions to deny coverage were unmoored from the reality of Z.S.'s condition. In the medical notes for Z.S.'s first few months of therapy at Elevations (February through May) the phrase "high risk for suicide and self-harm behaviors" shows up at least thirteen times. Z.S. was noted to self-harm, including by eating food he was allergic to so that he could have an excuse for purging, several times during this time period. Clinicians who had treated Z.S. (and who were treating him at Elevations) wrote letters opining that he needed the residential treatment he received at Elevations to remain safe. Clinician notes from Z.S.'s time at Elevations paint a picture of a young man who was struggling to remain safe, stable, and healthy even *with* the 24/7 supervision and care provided by residential treatment. All of this evidence pointed inexorably to the conclusion that Z.S. needed the residential mental health treatment he received at Elevations.

Undeterred, Cigna opted not to meaningfully engage with any of this evidence and to continue repeating the same conclusion: Z.S. did not need residential treatment starting on February 5, 2019 because he could be safely treated without 24/7 monitoring and care. In reiterating this conclusion, Cigna did not cite to any specific provisions of Z.S.'s medical records, did not cite to any specific provisions of the Plan, and never engaged with the arguments or evidence Plaintiffs submitted in support of Z.S.'s claims. Under any standard of review, this

paltry reasoning was insufficient to uphold Cigna's denials. Accordingly, the Court should award summary judgment to Plaintiffs on their first cause of action.[1]

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Z.S.'s Medical History Prior to Elevations

1. Z.S. was born in mid-Spring of 2003.[2]

2. Z.S. was assigned female at birth, but would eventually come out as a transgender male.[3]

3. As young as preschool, Z.S.'s teacher expressed concerns that he was "'worried' a lot of the time[,]" noting that he had begun panicking one day because he could not account for one of the other four-year-olds in his class.[4]

4. Z.S.'s preschool teacher encouraged Z.S.'s parents to "keep an eye on" his "fretting and worrying[.]"[5]

5. Z.S.'s parents also took him to a therapist who "specialized in childhood anger" when he was six years old due to emotional outbursts that he could not control while at home.[6]

6. In approximately fourth grade, Z.S. found himself often sorted in with girls for physical education, recess, and other activities.[7]

---

[1] Having received discovery and reviewed the record, Plaintiffs notify the Court and Defendants that they do not intend to pursue their second cause of action alleging that Defendants violated the Mental Health Parity and Addiction Equity Act ("MHPAEA"). While Plaintiffs still believe United regularly violates MHPAEA as a matter of course and may well have done so in this case, the relative strength of Plaintiffs' first cause of action persuades them it is not necessary to reach that issue.
[2] Rec. 3922.
[3] *See* Rec. 2671.
[4] Rec. 2671.
[5] Rec. 2671.
[6] Rec. 2671.
[7] Rec. 2671.

7.  Z.S. did not fit in very well with the girls, and so was "bullied or simply left out" when this happened.[8]

8.  As a result, Z.S.'s parent described him as "visibly depressed" but "able to convince therapists that he was 'fine'" by fourth grade.[9]

9.  In sixth grade, when Z.S. was 11 years old and not long after he started menstruating, Z.S.'s parents discovered that he had begun self-harming through cutting.[10]

10. Z.S. began seeing a school counselor to address his self-harm at this time.[11]

11. The summer between sixth and seventh grade, Z.S.'s family moved from California to Texas and Z.S. started at a new school.[12]

12. At that point, Z.S. began cutting again, hiding it form his parents for several months.[13]

13. In January of his seventh grade year, Z.S. came out to his parents as transgender.[14]

14. Z.S. began seeing a clinical psychologist who specialized in adolescence, and revealed to this psychologist that "he had been thinking about killing himself but that he did not have a plan at that time."[15]

15. Z.S. began treatment with "a pediatric gender clinic" that began treating his gender dysphoria through gender-affirming care.[16]

---

[8] Rec. 2672.
[9] Rec. 2672.
[10] *See* Rec. 2672.
[11] *See* Rec. 2672.
[12] *See* Rec. 2672.
[13] *See* Rec. 2672.
[14] *See* Rec. 2672.
[15] Rec. 2672.
[16] *See* Rec. 2672.

16. For a while, Z.S. "seemed to do okay."[17] He had "a couple of bouts of depression that were accompanied by self-harm (cutting)" throughout eighth grade but was generally in good spirits, participating in sports, and getting good grades.[18]

17. However, in the latter part of the summer just before his night grade year, "[Z.S.] had a deeply depressive episode, had a more severe cutting episode than he'd had before (the cuts were deeper and there were more of them)[,] and admitted to having thoughts of suicide" albeit again without a plan.[19]

18. Because of this, Z.S.'s therapist informed his parents that he did not think he was doing enough to help Z.S. and recommended they seek a different therapist and group therapy.[20]

19. Z.S.'s parents found another therapist and placed him in a dialectical behavioral therapy (DBT) group therapy program.[21]

20. However, on October 2, 2017, "the therapist that ran the DBT group" informed Z.S.'s parents that "[Z.S.] had expressed pretty consistent and fairly intense suicidal ideation over the previous week, and [the therapist] wanted to let [Z.S.'s parents]know that she thought an escalation in care was in order."[22]

21. Z.S.'s parents called his psychiatrist, who "encouraged [them] to take [Z.S.] to the hospital right away."[23]

---

[17] Rec. 2672.
[18] Rec. 2672.
[19] Rec. 2672.
[20] *See* Rec. 2672-73.
[21] *See* Rec. 2673.
[22] Rec. 2673.
[23] Rec. 2673.

22. Accordingly, "Z.S.'s first hospitalization started on October 3, 2017, and he was hospitalized for 8 days, until October 11, 2017[.]"[24]

23. On October 3, Austin Oaks Hospital for acute inpatient hospital treatment memorialized that this admission was due to "[s]uicidal ideations with a plan to commit suicide by overdose. Dangerousness to self with need for controlled environment. Failure of social and occupational functioning."[25]

24. Z.S. articulated his chief complaint or reason for admission on October 3, 2017: "I was feeling really suicidal for the last week and now I can't tell anyone that I will [remain] safe."[26]

25. After discharging from the hospital, Z.S. enrolled in a Partial Hospitalization Program ("PHP") for twelve weeks.[27]

26. Z.S. then enrolled in an intensive outpatient program ("IOP") for four additional weeks.[28]

27. After the IOP, Z.S. did weekly therapy sessions with a primary therapist.[29]

28. Unfortunately, approximately five weeks after completing the IOP, Z.S. "had a bout of depression and cutting and admitted to having suicidal thoughts," leading to a second hospitalization that lasted for four days.[30]

---

[24] Rec. 2673.
[25] Rec. 4024.
[26] Rec. 4024.
[27] *See* Rec. 2673.
[28] *See* Rec. 2673.
[29] *See* Rec. 2673.
[30] Rec. 2673.

29. After being released from his second hospitalization, Z.S. started another IOP program.[31]

30. While Z.S. "liked the program," he "struggled to get his momentum back" and "could not get out of bed to go to school[.]"[32]

31. Z.S.'s parents "eventually decided that school was not worth the added stress to his well-being" and withdrew Z.S. in April 2018 "with the intention that he would enroll in online high school" instead.[33]

32. However, during his sixth week of his second IOP, Z.S. "admitted to feeling extremely suicidal" and articulated that he had a plan for "how and when" he would die by suicide.[34]

33. This led to Z.S.'s third hospitalization, which lasted for "a couple weeks[.]"[35]

34. During this hospitalization, Z.S.'s psychiatrist pointed out that he had suffered "'three hospitalizations in less than nine months[,]'" pointed out that it was "clear that [Z.S.'s] issues with his mental health are separate from his gender identity struggles[,]" and strongly suggested that Z.S.'s parents begin looking into residential treatment.

35. Z.S.'s psychiatrist indicated that:

> [A] clearer link between [Z.S.'s mental health issues and his gender identity struggles] would mean that the physical and social transition to male would ease [Z.S.'s] mental health issues [but that] instead we were seeing a relatively short-lived bump in his

---

[31] *See* Rec. 2673.
[32] Rec. 2673.
[33] Rec. 2673.
[34] Rec. 2673-74.
[35] Rec. 2674.

mood each time we took a step, but then a return to the anxiety and depression that [Z.S. had] struggled with for years.[36]

36. In May 2018, Z.S. transferred from the hospital to Evolve Treatment Center ("Evolve"), where he stayed for thirty days and began taking lithium to control his suicidal thinking.[37]

37. Following his treatment at Evolve, the clinical staff "strongly suggested" that Z.S.'s parents consider long-term residential treatment for Z.S. or, if his parents were unwilling to place him in residential treatment, suggested that he needed another IOP.[38]

38. Believing that he would be able to maintain himself with the help of the lithium, Z.S.'s parents opted to enroll him in Sage Wellness, an IOP, beginning in August of 2018.[39]

39. For his tenth grade year, Z.S. began attending a new high school and initially seemed to be doing well.[40]

40. Z.S. graduated from the Sage Wellness IOP "with flying colors" on September 17, 2018.[41]

41. Unfortunately, as Z.S.'s mother would later report:

> A few days before Halloween, about 6 weeks after completing Sage Wellness, [Z.S.] texted me from school that he was not feeling safe with himself. When we picked him up from school, he admitted that he had been cutting again (for a few days) and was having suicidal thoughts. We took him to the hospital he stayed a week. They made changes to his medications. Upon discharge, we had arranged for him to start over with the IOP at Sage Wellness,

---

[36] Rec. 2674.
[37] *See* Rec. 2674.
[38] Rec. 2674.
[39] *See* Rec. 2674.
[40] *See* Rec. 2674.
[41] Rec. 2674.

but the day before he was scheduled to start it was clear he needed
to go back to the hospital. This time he was there for three weeks
and we knew he needed [a] residential treatment program. During
this time, [Z.S.] completed a psychiatric evaluation at the
Georgetown Behavioral Health Institute. There were several more
medication changes and additions during this hospitalization.[42]

42. The Georgetown Behavioral Health Institute psychiatric evaluation, which was

conducted on December 13, 2018,[43] reported that Z.S. was still "engaging in self

harm behavior through picking at skin" and struggling "to use other coping skills."[44]

Z.S. also had "thoughts of self harm" and struggled "to let go of or challenge negative

thoughts[,]"and acknowledged feeling anxiety and passive suicidal ideation.[45]

43. Following this, Z.S.'s parents described:

We found Polaris Teen Center, which was an incredible program
and [Z.S.] was able to do a lot of good work there. But the work he
did there was just the beginning. The clinical staff's strong
recommendation was long-term residential treatment for [Z.S.]
They said that he ha[d] deeply entrenched issues that need to be
dealt with in a controlled and safe environment, consistently, for an
extended period.[46]

44. Four days prior to his admission into Elevations, in a checklist attempting to identify

"precipitating conditions that have led to [Z.S.'s] behavioral deregulation in the

past[,]" Z.S.'s parents wrote "[t]he only pattern that we have seen is that just before

[Z.S.] plummets into life-threatening depression he usually seems to be doing

great."[47]

//

---

[42] Rec. 2674 (footnote omitted).
[43] *See* Rec. 4064 (begin of examination), 4065 (noting this date the examination and resultant
recommendations were offered).
[44] Rec. 4065.
[45] Rec. 4066.
[46] Rec. 2675.
[47] Rec. 4108.

//

### Z.S.'s Treatment at Elevations

45. Z.S. was admitted to Elevations on February 5, 2019.[48]

46. During a "Psychiatric Admission Evaluation" conducted on February 6, 2019,[49]

    clinicians at Elevations made the following observations:

- Both Z.S. and "corroborative records" described "depressive aspects that have been severe in nature and have occurred over the last 4 years."[50]

- Z.S. admitted to "suicidal and self-harm urges last night" – i.e. on February 5, 2019.[51]

- Z.S. denied self-harm but noticed he continued to "pick at" (reopen) his scabs, Elevations' clinicians noted Z.S. did not view as self-harm, but also noted that Z.S.'s previous treating clinicians had seen as self-harm.[52]

- Elevations staff observed that "[g]enerally, [Z.S.] has struggled to maintain safety for significant periods of time outside of institutionalized settings."[53]

- Z.S. "[d]enie[d] acute suicidal, homicidal, self-harm, or AWOL ideation" but "[a]cknowledge[d] self-harm and suicidal ideation within the past approximately 12 hours" while denying "current plan or intent." Staff also noted that Z.S.'s "[i]nsight" was "limited" and that his "[j]udgment and comprehension" also appeared "limited."[54]

- Elevations staff created a "Preliminary Treatment Plan" that: (1) placed Z.S. in daily group therapy, weekly individual and family therapy, and other therapies "upon further evaluation" and "as safety allows[,]" (2) anticipated that Z.S. would see an "overall number of medication reduction" and discussed a possible "stimulant trial[,]" and (3) estimated that Z.S. would stay at Elevations "4 to 12 months" before "step-down to lower acuity setting vs. home with wrap around services."[55]

---

[48] *See* Rec. 4156.
[49] Rec. 3922.
[50] Rec. 3923.
[51] Rec. 3923.
[52] Rec. 3923.
[53] Rec. 3923.
[54] Rec. 3924.
[55] Rec. 3925.

47. As of February 6, 2019, Z.S. was diagnosed with:

> MAJOR DEPRESSIVE DISORDER, RECURRENT, SEVERE
> WITHOUT KNOWN PSYCHOTIC FEATURES
>
> GENERALIZED ANXIETY DISORDER
>
> PANIC DISORDER WITHOUT AGORAPHOBIA
>
> GENDER DYSPHORIA
>
> NON-SUICIDAL SELF-HARM
>
> RULE OUT BIPOLAR
>
> RULE OUT EATING DISORDER, UNSPECIFIED
> (PRIMARILY BINGE EATING TYPE)[56]

48. While at Elevations, Z.S.'s records reflect at least the following incidents:

- February 7, 2019 – noted to have "[r]egular thoughts" of self-harm and a "vague plan," causing Elevations' clinicians to indicate he was at "moderate risk" in his "Self-Harm / Suicide Risk Assessment[.]"[57]

- February 16, 2019 – noted to have "seemed depressed."[58]

- February 19, 2019 – during family therapy, Z.S. "spoke about his discomfort in treatment, appearing to try to balance pleasing the therapist while convincing his parents to pull him from treatment" but "[Z.S.'s] parents were able to hold boundaries and encourage [Z.S.] to focus on his own treatment and coping."[59]

- February 26, 2019 – during a psychiatric evaluation, Dr. Michael Connolly, M.D. noted "I met with [Z.S.] today to review ongoing care. [Z.S.] generally reported doing 'okay', and minimized concerns other than ongoing nausea. Continuing to monitor adjustment to the program overall."[60]

- February 26, 2019 – during family therapy, a therapist noted "[Z.S.] was manipulative towards me and his parents, using DBT words while being rigid and having black and white thinking such as stating he feels unsafe and uncared for

---

[56] Rec. 3925.
[57] Rec. 3920.
[58] Rec. 3883.
[59] Rec. 3876.
[60] Rec. 3853.

unless he was able to get his way. [Z.S.] had difficulty with acceptance and walking the middle path."[61]

• February 27, 2019 – during "study hall" following his dinner, Z.S. asked staff "for something for his stomach due to him not feeling well" and "threw up in the group room" during that conversation.[62]

• February 28, 2019 – during a nutritional screening, Elevations staff observed that Z.S. had a "sensitivity to soy" and needed to avoid it.[63]

• February 28, 2019 – Z.S. reported having vomited at "1932" hours (7:32 p.m.).[64]

• March 3, 2019 – during a "Nursing Assessment," it was observed under the heading "Nutritional Status" that "[Z.S.] weighed 218 on 2.5.19 and now [weighs] 231.6 on 3.1.19. [Z.S.] reports some over eating since arriving."[65]

• March 6, 2019 – during individual therapy, Z.S.'s therapist observed that his "Thought Content/Process" was "Tangential, Ruminations, Poor Historian, Resistant[,] and Cognitive Distortion" and describes Z.S.'s "Affect" as "Anxious, Labile[,] and Restless[.]"[66]

• March 6, 2019 – after his previous bouts of nausea, Dr. Connolly made a startling discovery and noted in a "progress note" compiled on March 8, 2019 that: "I met with [Z.S.] … in a common area of the dormitory within staff sight on 03/06. At that point, confronted [Z.S.] on purposeful ingestion of soy, making complaints about nausea very difficult to determine causation. Likewise, confronted the reality that this may be purposeful in order to have reason to purge after binge eating, which is certainly evident. As such, our discontinuation of Metformin due to complaint about nausea seems to have not been [effective] in reducing the complaints of nausea, which have been fairly consistent but often it appears driven by nutritional choices. Parents consented to a retrial of Metformin[.] …"[67]

• March 14, 2019 – While Z.S. did not report "thoughts of hurting self" at the moment, his therapy worked on helping him to "describe the onset of self-harm urges as well as the thoughts and feelings associated with self-harm urges" and specifically discussed Z.S.'s "urges and self-image" including "some negative core belief[s] his eating is related to[.]"[68]

---

[61] Rec. 3849.
[62] Rec. 3847.
[63] Rec. 3841.
[64] Rec. 3846.
[65] Rec. 3831.
[66] Rec. 3824.
[67] Rec. 3813.
[68] Rec. 3779.

- March 14, 2019 – Elevations staff reported that Z.S. "seemed quite a lot and not being around his peers" and then vomited during the swing shift.[69]

- March 19, 2019 – during family therapy, a therapist noted that Z.S. was struggling with "[t]houghts of hurting self" and observed "*[Z.S.] is at high risk for self-harm and suicidal behavior outside of a restricted environment*. He will continue be encouraged to be aware of thinking errors and develop an internal locus of control."[70] The therapist further reported that "[Z.S.] struggled with recognizing that his emotions and perceptions aren't fact" during this encounter.[71]

- March 19, 2019 – during the swing shift, Elevations staff observed that Z.S. interacted "minimally yet well with staff and peers" but that he appeared "somewhat sick" and went to bed "early[.]"[72]

- March 20, 2019 – during the swing shift, Elevations staff observed that Z.S. "seemed to be very quiet and seemed to really keep to himself during the shift."[73]

- March 21, 2019 – during individual therapy, Z.S.'s therapist noted that "*[Z.S.] is at high risk for self-harm and suicidal behaviors outside of a restricted environment as his thinking errors remain high and he lacks awareness and internal regulation.*"[74]

- March 27, 2019 – during family therapy, Z.S.'s therapist reported that he was "*at high risk for self-harm and suicidal behaviors* as his thinking errors surrounding others not liking him and his sensitivity to this are extremely high[,]" further indicated "[Z.S.] was distressed and resisted recognizing his thinking errors" during the session.[75]

- March 29, 2019 – during individual therapy, Z.S.'s therapist indicated Z.S. was "*at high risk for suicidality* as his obsessions and perceptions of being disliked remain high" and noted that "[h]e had difficulty recognizing times that people had shown positive feelings towards him or seeing other perceptions of what others['] behaviors may have meant, remaining very fixed in his reality."[76]

---

[69] Rec. 3777.
[70] Rec. 3764 (emphasis added).
[71] *Id*.
[72] Rec. 3763.
[73] Rec. 3760.
[74] Rec. 3759 (emphasis added).
[75] Rec. 3734 (emphasis added).
[76] Rec. 3729 (emphasis added).

- April 2, 2019 – during family therapy, Z.S.'s therapist noted: "*[Z.S.'s] lack of insight and low ability to regulate his mood makes him highly likely to engage in self-harm and suicidality outside of a residential environment*."[77]

- April 4, 2019 – during individual therapy, Z.S.'s therapist observed "*[Z.S.] maintains low insight and high risk of self-harm behaviors.*"[78]

- April 10, 2019 – during family therapy, Z.S.'s therapist observed "[Z.S.] maintains high distress at perceived lack of perfection in himself and in relationships. This along with lack of internal locus of control and minimal emotion regulation skills *continue to keep [Z.S.] at high risk for self-harm behaviors*."[79]

- April 11, 2019 – during individual therapy, Z.S. "disclosed having passing urges to self-harm recently but no plans to self-harm" and "described the urges as several times a day at an intensity of 6/10 and lasting around 5 minutes if he is busy and longer if he doesn't have much to do or is alone. [Z.S.] identified feeling like people don't like him and disliking his body as triggers for self-harm. He had difficulty identifying the function of self harm."[80] As a result, Z.S.'s therapist determined he remained "*at high risk for self-harm and suicidal behaviors in an outpatient environment*."[81]

- April 16, 2019 – during family therapy, Z.S.'s therapist noted that: "[Z.S.'s] affect changed rapidly between fidgeting, talking loudly and tangentially, to laying his head back, whispering, and saying few words. [Z.S.] often distracted from feeling down by story telling and using analogies. He was hesitant to talk about his body image with his parents, however, eventually disclosed his negative self-image throughout his life-time including the current." This caused Z.S.'s therapist to opine "*[Z.S.] continues to be at high risk for suicidal and self-harm behaviors outside of a residential treatment setting* as he lacks emotion regulation, has extremely low self-esteem and lacks internal locus of control."[82]

- April 17, 2019 – Dr. Connolly reported that Z.S. had begun refusing Latuda, indicating that it made him nauseous, noted he would be "watching for impacts overall both in nausea and emotional stability."[83]

---

[77] Rec. 3717 (emphasis added).
[78] Rec. 3707 (emphasis added).
[79] Rec. 3687 (emphasis added).
[80] Rec. 3683.
[81] *Id* (emphasis added).
[82] Rec. 3664-65 (emphasis added).
[83] Rec. 3741. The Court may take judicial notice that "Latuda" is an antipsychotic and antidepressant medication (*see Lurasidone (Oral Route)*, Mayo Clinic, available at: https://www.mayoclinic.org/drugs-supplements/lurasidone-oral-route/side-effects/drg-20074588?p=1 (last retrieved November 22, 2023)).

- April 18, 2019 – during individual therapy, Z.S.'s therapist concluded that "*[Z.S.] remains at high risk for relapse in suicidal and self-harm behaviors in an outpatient setting due to lack of internal locus of control and low ability to regulate emotions.*"[84]

- April 24, 2019 – during individual therapy, Z.S.'s therapist concluded that "*[Z.S.] continues to be at high risk for self-harm outside of a residential setting* as he lacks emotion regulation, internal locus of control, and boundary setting abilities for healthy relationships."[85]

- April 30, 2019 – during family therapy, Z.S.'s therapist concluded that "*[Z.S.] remains at high risk of self-harm outside of an inpatient environment* due to lack of emotion regulation, impulse control, and feelings of being alone and persecuted in his experiences regardless of consistently offered support."[86]

- May 3, 2019 – during individual therapy, Z.S.'s therapist noted that "*[Z.S.] remains at a high risk level* as he is resistant to following through with what is discussed in family, group, and individual sessions. He continues to lack an internal locus of control and emotion/behavior management skills."[87]

- May 5, 2019 – in an update to Z.S.'s "Master Treatment Plan," his therapist noted "[Z.S.] has identified urges to self-harm when he is feeling anxious as well as depressed and has practiced coping through reading and doing puzzles."[88]

- Unknown date near "05/07/2019"[89] – during individual therapy, Z.S.'s therapist noted that the "Plan" going forward was "[Z.S.] will continue to work on seeing flexibility and gray areas in thoughts, feelings, and relationships. [Z.S.'s] rigidity and intense reactions *keep him at high risk for suicidal and self-harm behaviors*."[90]

- May 8, 2019 – during the swing shift, Elevations staff noted that Z.S. "appeared to be crying at different times during the night."[91]

---

[84] Rec. 3654 (emphasis added).
[85] Rec. 3616 (emphasis added).
[86] Rec. 3588 (emphasis added).
[87] Rec. 3577 (emphasis added).
[88] Rec. 3476.
[89] *See* Rec. 3556 (the therapy record in question is not dated, but was signed on May 7, 2019 at 12:50 p.m.).
[90] *Id.* (emphasis added).
[91] Rec. 3546.

- May 10, 2019 – during individual therapy, Z.S.'s therapist noted that Z.S. had "[t]houghts of hurting self" and "*remains at high risk for self-harm and suicidal behaviors*."[92]

- May 14, 2019 – during family therapy, Z.S.'s therapist recorded a plan for Z.S. to "allow himself to experience the emotions with overwhelm and allowing them to go where they need to go, then advocating for what he needs at that time whether it's to be on precautions, punch something, yell, cry, talk, etc"[93]

- May 16, 2019 – a swing shift log compiled the Elevations clinicians indicated:

    [Z.S.] seemed depressed, after the team building activity [Z.S.] asked to go into the time out room at around 18:12 and left around 18:57. While in the time out room [Z.S.] continued to punch the walls after staff asked him to stop. He also started to bang his head. While in the time out room *[Z.S.] stated that he's been having suicidal thoughts and that he wanted to die*. Staff found out that *he self harmed early in the week*, [Z.S.] also turned over his contraband. [Z.S.] processed with staff about feeling a lot of pressure and not being able to express how he is feeling. He also talked about feeling like he needs to be perfect and wanting to just be "normal". Staff spoke to [Z.S.] about small ways he can start taking off his mask. Once he left the time out room he stayed by staff for the remainder of the evening engaging in casual conversation seeming less emotional minded as the night went on. He was placed on room and bathroom interventions.[94]

- May 17, 2019 – during individual therapy, Z.S.'s therapist indicated Z.S. stated "he doesn't feel an urge to self-harm at this point" and "committed to journaling about his feelings instead of self-harming when he has an urge."[95]

- May 18, 2019 – Elevations' staff observed that Z.S. "seemed to be in a melancholy and sad mood" and that he "kind of isolated [a lot] and kept to himself" while "struggling with his mood."[96]

- May 21, 2019 – after family therapy, Z.S.'s therapist memorialized Z.S. was having "[t]houghts of hurting self[.]"[97]

- May 28, 2019 – following family therapy, Z.S.'s therapist noted that "[Z.S.] remains highly codependent and at *high risk of self-harm and suicidal ideation*.

---

[92] Rec. 3540 (emphasis added).
[93] Rec. 3526.
[94] Rec. 3519.
[95] Rec. 3515.
[96] Rec. 3511.
[97] Rec. 3500.

[Z.S.] will practice acceptance of loss at some point while being in the present and knowing that he is OK in the now."[98]

- May 30, 2019 through June 1, 2019 – during a camping trip, Elevations staff noticed Z.S. "struggled with food" and "[a]t one point" was "observed throwing up behind bushes and then came out and helped himself to another big plate of food[,]" although staff noted they "[thought] he only did this once."[99] Elevations staff noted that "[t]his camping trip was a good indication of how [Z.S.] will be outside of treatment with no structure and it is clear that [Z.S.] struggles with self-portioning in an unstructured environment and he still needs to work on that."[100]

- June 4, 2019 – after family therapy, Z.S.'s therapist memorialized Z.S. was having "[t]houghts of hurting self[.]"[101]

- June 20, 2019 – in an update to Z.S.'s "Master Treatment Plan," his therapist noted "[Z.S.] has been coping well and developing tolerance with his urges to self harm and reports that the urges fluctuate."[102]

- June 28, 2019 – after family therapy, Z.S.'s therapist memorialized Z.S. was having "[t]houghts of hurting self[.]"[103]

- July 29, 2019 – while "off of his medication" in preparation for psychological testing, Z.S. reported that he was again experiencing "[t]houghts of hurting self[.]"[104] However, that same day, Z.S.'s therapist noted he was reporting "mostly intrusive self-harm thoughts rather than true urges" and reported "more compulsive self-harm than intentional self-harm[.]"[105] Z.S.'s therapist also indicated that Z.S.'s thinking patterns were improving because while he "continue[d] to struggle with black and white thinking" he had "made some progress in being able to work in the grey area and not be overwhelmed."[106]

- September 5, 2019 – after a relatively good and uneventful August, Z.S. recognized during individual therapy that he was experiencing symptoms consistent with being "before and after depressive episodes" and reported that it would last "until he hit[ ] a wall or eventually [ran] out of steam."[107] He also reported he had thoughts of hurting himself.[108] Z.S.'s therapist noted Z.S. was

---

[98] Rec. 3466 (emphasis added).
[99] Rec. 3455.
[100] *Id.*
[101] Rec. 3444.
[102] Rec. 3270.
[103] Rec. 3327.
[104] Rec. 3183.
[105] Rec. 3125.
[106] Rec. 3123.
[107] Rec. 3007.
[108] *Id.*

"open and cooperative" during this process but "could not manage his mind enough to fully engage in any interventions."[109]

- September 26, 2019 – after weathering some depression that he had seen coming, Z.S. reported "[n]o thoughts of hurting self" and his therapist noted that, going forward, the goal was for Z.S. to "continue working towards finding wise solutions" for his struggles.[110]

**Cigna's Denials and Plaintiffs' Appeals**

49. Z.S. was admitted to Elevations on February 5, 2019.[111]

50. On February 15, 2019, Cigna sent a letter denying Z.S.'s claims for the treatment he

received at Elevations, stating:

> We received information from Elevations RTC, your health plan and any policies and guidelines needed to reach this decision. We found the service requested is not medically necessary in your case.
>
> Based upon the available information, your symptoms do not meet the Cigna Behavioral Medical Necessity Criteria for Residential Mental Health Treatment for Children and Adolescents for continued stay from 02/05/2019 forward as the treatment provided has led to sufficient improvement in the symptoms and/or behaviors that led to this admission so that you could be safely and effectively treated at a less restrictive level of care.[112]

51. Cigna's letter does not clarify how Z.S. improved so much on February 5, 2019 that

"the treatment provided" in that single day "led to sufficient improvement in the

symptoms and/or behaviors that led to this admission" so that Z.S. "could be safely

and effectively treated at a less restrictive level of care."[113]

52. Plaintiffs appealed on December 26, 2019.[114]

---

[109] *Id.*
[110] Rec. 2924.
[111] *See* Rec. 4156.
[112] Rec. 2668-69.
[113] Rec. 2668-69.
[114] Rec. 2668.

53. Plaintiffs cited extensively from Z.S.'s medical records to support their appeal.[115]

54. Plaintiffs also attached a letter from Dr. John Abraham, D.O., explaining his position

that it was medically necessary for Z.S. to be treated at Elevations because:

> I treated [Z.S.] from April, 2016 to October, 2018 for MDD, GAD,
> and Gender dysphoria. The patient has had psychiatric symptoms
> going back to early childhood. Between 5th and 6th grade, the
> patient had onset of depressive symptoms and gender dysphoria
> with progression to self-injury by his 7th grade year. Trials of
> Lexapro, Prozac, Wellbutrin, Abilify, and lithium along with
> individual therapy including DBT were of limited value.
> Trazodone was added for sleep and Intuniv as well as Vistaril were
> also tried. By July of 2017, the patient's mood started to decline
> steeply and required hospital stays in October of 2017, March of
> 2018, May of 2018, October of 2018, and November 2018. Given
> the limited improvement from outpatient treatment and multiple
> hospital stays, [Z.S.] will benefit from long term residential
> treatment.[116]

55. The December 26, 2019 appeal also included a letter from Greg Miller, LMFT, which

indicated:

> I am a Licensed Marriage and Family Therapist in both Texas and
> California with a private therapy practice in Austin, Texas. I have
> been working with adolescents for over 20 years. I met with [Z.S.]
> in individual counseling sessions from August 10, 2016 through
> August 22, 2017. [Z.S.'s] primary presenting problem was self-
> harm, which had begun approximately 18 months prior to the start
> of therapy. He was also struggling with depression – including
> suicidal ideation – and gender identity. My initial impressions of
> [Z.S.] were that he was a highly intelligent, thoughtful, and
> creative person who cared deeply for others.
>
> Therapy consisted mainly of cognitive behavioral interventions
> with some secondary mindfulness-based approaches. Though
> [Z.S.] was clearly motivated to eliminate his self-harming and took
> his therapy appointments seriously, the work we did in therapy did
> not eliminate the behavior. For example, we would contingency
> plan for times when he had thoughts of self-harm, but [Z.S.] was
> not able to consistently use these plans to prevent the behavior.

---

[115] *See, e.g.,* Rec. 2678-96 (consisting almost entirely of quotations from Z.S.'s medical records).
[116] Rec. 2822.

Based on my experience working with [Z.S.] along with the updates his parents have given me, I could not assert more strongly that I feel residential treatment is the appropriate level of care for him. I have researched Elevations, spoken with colleagues in Texas and California who have referred clients there, and have had a number of long conversations with [Z.S.'s] father about the program. Based on all of this, I firmly believe the treatment provided at Elevations is entirely within the generally accepted standards of care.[117]

56. The December 26, 2019 appeal contained a third letter from Ryan Dillon, LPC, which

indicated:

I began working with [Z.S.] in August 2017 with our last session being September 2018. The client and his family reached out to me and identified three main reasons for beginning treatment: gender related issues, anger management, and intermittent self-harming. My initial impressions once working with [Z.S.] was that he was very artistic, creative, and had a passion to learn and responded best to treatment and outlets such as these. [Z.S.] was a highly sociable person and desired to be around people and make friends but had issues being open, honest, and vulnerable about himself. These issues presented themselves in session as [Z.S.] had some issues opening up and sharing their thoughts and feelings.

A narrative therapy approach was utilized with [Z.S.] This approach appeared to work for some time as [Z.S.] enjoyed creating characters and sharing his struggles through them. This assisted [Z.S.] in opening up more about himself and the issues and struggles that he was facing. However, many of the client's issues presented outside of session with thoughts of self-harm. The client stated that he had a difficult time remembering any of the coping skills and tools discussed in session when these thoughts arrived. Throughout our time together [Z.S.] was in and out of in-patient treatment but consistently identified that he didn't feel like they helped him but stated he had less intrusive thoughts while participating in groups during in-patient treatment and being around people that understood him and his struggles.

Due to [Z.S.'s] passion to learn, desire to connect with others, and the safety and community [Z.S.] feels when being around other people I believe that residential treatment is the most appropriate level of care for [Z.S.] I believe that by being able to express his creative side while learning coping skills and tools in a residential

---

[117] Rec. 2824.

> community that [Z.S.] can making the [lasting] changes and
> growth that is needed. Based on the information I have been
> provided by [Z.S.'s] mother, [K.S.,] and my own independent
> research into Elevations I believe this treatment is within generally
> accepted standards of care and highly beneficial to [Z.S.] and his
> continued growth.[118]

57. On January 28, 2020, Cigna sent another letter affirming its denial from "02/05/2019

- 10/17/2019[.]"[119]

58. The January 28, 2020 letter indicated that Z.S.'s claims were denied because:

> Based upon the available clinical information received initially and
> with this appeal, your symptoms did not meet Behavioral Health
> Medical Necessity Criteria for admission and continued stay at
> Residential Mental Health Treatment for Children and Adolescents
> level of care form 02/05/2019 - 10/17/2019 as although you had
> long term symptoms and a lengthy treatment history you did not
> show a clear need for 24 hour nursing and psychiatric monitoring
> and intervention.

59. On April 24, 2020 Cigna sent a final denial letter upholding it's denial of Z.S.'s

claims.[120]

60. The April 24, 2020 denial letter indicated Z.S.'s claims were denied because:

> Based upon the available clinical information received initially and
> with this appeal, your symptoms did not meet Behavioral Health
> Medical Necessity Criteria for admission and continued stay at
> Residential Mental Health Treatment for children and Adolescents
> level of care from 02/05/2019-03/09/2020 as although you were
> demonstrating impairments in functioning secondary to a mental
> health disorder, you did not have symptoms requiring active
> treatment at a 24 hour level of care. You had just discharged from
> previous mental health residential treatment and that treatment
> resulted in clinical improvement such that you were no longer
> requiring treatment at a 24 hour level of care. While you do have a
> history of chronic, intermittent suicidal ideation, at the time of your
> admission you had not recently demonstrated actions or made
> serious threats of harm to yourself or others as a result of a mental
> health disorder that were of such severity to require the intensity of

---

[118] Rec. 2826.
[119] Rec. 444.
[120] *See* Rec. 2652.

treatment intervention and 24 hour monitoring of a Residential Mental Health Treatment program for your safe and effective treatment. You were not reported to be exhibiting aggressive behavior or disordered thinking. You were showing behavioral control. You were not reported to have medical instability. You were compliant with medications and tolerating them. You were able to care for your basic needs. You were described as having a supportive family. Less restrictive levels of care were available to assist you with continuing to learn healthy coping skills and for medication management.

61. Having exhausted their prelitigation appeal obligations, Plaintiffs initiated this lawsuit.

## Relevant Plan Provision

62. Under a subheading entitled "Notice of Benefit Determination on Appeal," the Plan indicates that all notices of denial issued under the Plan will explain: "the specific reason or reasons for the [denial,]" including "reference to the specific plan provisions on which the determination is based[,]" and a notice that claimants have a right to receive, free of charge, "an explanation of the scientific or clinical judgment for a determination that is based on a Medical Necessity" analysis.[121]

63. The Plan provides that its administrators reserve the discretion to "determine[ ]" whether a given treatment meets the factors for "Medical Necessity."[122]

## STANDARD OF REVIEW

The Court should grant summary judgment if Plaintiffs show that "there is no genuine dispute as to any material fact" and that Plaintiffs are "entitled to judgment as a matter of law."[123] However, when both parties to a cause of action involving wrongful denial of ERISA benefits under 29 U.S.C. § 1132(a)(1)(B) move for summary judgment, thereby effectively

---

[121] Rec. 4764.
[122] Rec. 4769.
[123] Fed. R. Civ. P. 56(a).

"stipulat[ing] that no trial is necessary, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[124] Further where, as here, the terms of a Plan reserve discretion for its administrators to determine whether a given treatment is medically necessary,[125] the Court will apply the "arbitrary and capricious" standard of review.

## ARGUMENT

### I.     UNDER THE ARBITRARY AND CAPRICIOUS STANDARD OF REVIEW, CIGNA'S DENIALS SHOULD BE REVERSED.

#### A.  Cigna's Denials Should Be Reversed Due to the Extensive Deficiencies in Its Denial Letters.

In *D.K. v. United v. United Behavioral Health*,[126] *David P. v. United Healthcare Insurance Company*,[127] and *Ian C. v. United Healthcare Insurance Company*,[128] the Tenth Circuit Court of Appeals repeatedly clarified the parameters of Defendants' fiduciary duties to Plaintiffs – particularly when issuing denials during the prelitigation appeals process. In these cases, the Tenth Circuit clarified that an ERISA administrator's denials are arbitrary and capricious if they fail to: (1) cite to specific provisions of the underlying insurance plan that the ERISA administrator contends justify its denials;[129] (2) support a medical necessity denial with

---

[124] *LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 796 (10th Cir. 2010) (citation and internal quotation marks omitted).
[125] *See* Rec. 4769 (reserving this discretion).
[126] 67 F.4th 1224 (10th Cir. May 15, 2023).
[127] 77 F.4th 1293 (10th Cir. Aug. 15, 2023).
[128] 2023 U.S. App. LEXIS 32051 (10th Cir. Dec. 5, 2023).
[129] *See D.K.*, 67 F.4th at 1243 (faulting an ERISA administrator for failing to provide denials with a "specific reference to the pertinent plan provision" on which they were based); *see also David P.*, 77 F.4th at 1312 (reiterating that an ERISA "administrator, in initially denying a claim for benefits, must convey to the claimant … the specific plan provisions on which the determination is based" (citation and internal quotation marks omitted)).

specific citations to the claimant in question's medical records, if those records are available to

the ERISA administrator;[130] (3) specifically address and engage with opinions by a claimant's

treating clinicians indicating that the claimant needed the treatment at issue;[131] and (4)

specifically address and engage with the claimant's (or those appealing on their behalf's)

arguments in favor of coverage.[132]

      Cigna's denials fail in all four of these respects. None of Cigna's denial letters cited to

specific provisions of the Plan that Cigna contended justified its denials. None of Cigna's denial

letters supported its medical necessity denials with specific citations to Z.S.'s medical records,

despite these records having been made available in Plaintiffs' appeals. None of Cigna's letters

specifically address and engage with either the letters submitted by Z.S.'s treating clinicians who

opined his treatment was medically necessary *or* with the contemporaneous notes from Z.S.'s

---

[130] *See D.K.*, 67 F.4th at 1242 ("[G]iven that [the ERISA administrator] was provided with extensive information, its conclusory [denials] without citing the medical record[ ] did not constitute a full and fair review."); *see also David P.*, 77 F.4th at 1312 (explaining that an ERISA administrator's denials "did not meet [the] minimal requirements for explaining why it deemed [a claimant's] treatment in RTC not to be medically necessary" because, among other reasons "[n]one of [the administrator's] denial letters cited to any of [the claimant's] records").
[131] *See D.K.*, 67 F.4th at 1241 (observing that an ERISA administrator's "duties under ERISA require them to address medical opinions, particularly those which may contradict their findings" in their denials and explicitly noting that failure to do so is arbitrary and capricious); *see also David P.*, 77 F.4th at 1312 (faulting an ERISA administrator for failing "to engage with the opinions of [a claimant's] treating care givers that she required treatment in an RTC")
[132] *See David P.*, 67 F.4th at 1309-10 (faulting an ERISA administrator for failing to "consider" and "separately state" a response to arguments for coverage advanced on appeal); *see also Ian C.*, 2023 U.S. App. LEXIS 32051 at *30 (noting that an ERISA administrator is "required to address" arguments for coverage advanced by a claimant on appeal), *D.K.*, 67 F.4th at 1241 (noting that ERISA administrators "must provide claimants with the rationales for denial prior to litigation because plan administrators who 'have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate to the beneficiary,' preclude the claimant from 'full and meaningful dialogue regarding the denial of benefits'" (quoting *Spradley v. Owens-Illinois Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012)).

treating clinicians who observed his needs on the record. And none of Cigna's letters specifically addressed or engaged with Plaintiffs' arguments in favor of coverage on appeal.

Given these failures, the *D.K.*, *David P.*, and *Ian C.* clearly indicate that Cigna's denials were arbitrary and capricious. Accordingly, the Court should award summary judgment to Plaintiffs on their first cause of action.

### B. Even Disregarding Cigna's Deficient Denial Letters, Cigna's Denials Should Also Be Reversed Because His Medical Records Demonstrate That His Treatment Was Medically Necessary As of February 5, 2019 and For Months Therafter.

Even if the Court does not reverse Cigna's denials because their defects demonstrate they were arbitrary and capricious, it should instead reverse Cigna's denials because "the record shows that benefits" for Z.S.'s residential treatment at Elevations starting on February 5, 2019 and for months thereafter "should clearly have been awarded by [Cigna]."[133]

As Z.S.'s records demonstrate, on his first day at Elevations (February 5, 2019) Z.S. struggled with both suicidal ideation and self-harm. His records throughout the next several months demonstrate that this was not an isolated incident – Z.S. continued to struggle with suicidal impulses, self-harm, and eventually intrusive self-harm thoughts and compulsive self harm. Z.S.'s treating clinicians consistently noted this put him at a severe risk for suicide and self-harm if he were to leave the sort of 24/7 supervision he received at Elevations, and even *with* that supervision Z.S. continued to self-harm, deliberately take food he knew he was allergic to as an excuse to purge, and voice suicidal ideation.

This evidence overwhelmingly supports the conclusion that when Cigna indicated Z.S. did not need residential treatment as of February 5, 2019, Cigna was wrong. Accordingly, if the Court does not reverse Cigna's denials because of Cigna's flagrant procedural errors, it should

---

[133] *D.K.*, 67 F.4th at 1243.

reverse Cigna's denials instead because the evidence in the record plainly demonstrates that Z.S.

needed the care he received at Elevations beginning February 5, 2019.

**II.    PLAINTIFFS REQUEST THE OPPORTUNITY TO BRIEF THEIR ENTITLEMENT PRE- AND POST-JUDGMENT INTEREST, REASONABLE COSTS, AND ATTORNEY FEES AT A LATER DATE.**

In the event that the Court grants Plaintiffs' Motion for Summary Judgment, Plaintiffs

request the opportunity to present in a future briefing additional information explaining their

damages and demonstrating why an award of prejudgment interest, attorney fees, and costs is

appropriate based on 29 U.S.C. § 1132(g).

## CONCLUSION

For the foregoing reasons, the Court should award summary judgment to Plaintiffs.

Dated this 25th day of December, 2023.

/s/ Brian S. King
BRIAN S. KING, P.C.
Attorney for Plaintiffs

26

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served to the all parties registered to receive service through the CM/ECF platform.

Dated this 25th day of December, 2023.


/s/ Brian S. King